UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JAMIE PETERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:19-cv-1105 |
| v. | ) | |
| | ) | |
| 3M COMPANY and AEARO | ) | |
| TECHNOLOGIES LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANT 3M COMPANY'S NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1332, 1441, 1442(a)(1), and 1446, Defendant 3M Company ("3M") hereby removes this action—which was filed in the Marion County Superior Court in the State of Indiana—to the United States District Court for the Southern District of Indiana, Indianapolis Division.  As grounds for removal, 3M states as follows:

1.    Plaintiff Jamie Peters is a U.S. Navy veteran, who seeks to hold Defendants 3M and Aearo Technologies LLC liable for hearing loss he allegedly suffered while serving in the U.S. Navy.  He contends that Combat Arms™ Earplugs, Version 2 ("CAEv2") were defectively designed and failed to provide adequate hearing protection. 3M denies these allegations.

2.    CAEv2 were designed by Aearo Technologies Inc. ("Aearo") in close collaboration with the U.S. military.[1]  CAEv2 represented a revolutionary breakthrough in hearing protection for service members by allowing soldiers to maintain situational awareness (*e.g.*, to hear nearby voice commands) while also maintaining some protection from gunfire and

---

[1]    3M acquired Aearo Technologies Inc. in 2008.  Aearo Technologies LLC, named in the Complaint, is a different entity from Aearo Technologies Inc.

other higher decibel impulse sounds.  CAEv2 met the U.S. military's specifications and helped the military provide hearing protection to service members.

3.      This Court has jurisdiction over this action and the case is therefore removable. Specifically, this action is removable on three separate grounds.

4.      *First*, this Court has diversity jurisdiction under 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000, and thus removal is proper under 28 U.S.C. § 1441.

5.      *Second*, removal is proper under 28 U.S.C. § 1442(a)(1) because Aearo was acting under the direction of a federal officer, and under color of federal office, when it designed and sold the CAEv2, and 3M intends to assert various federal defenses—including the federal contractor defense and the combatant activities defense—in response to Plaintiff's claims. *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1180 (7th Cir. 2012) (removal under the federal officer removal statute "promotes litigating federal defenses … in a federal forum so that 'the operations of the general government [are not] arrested at the will of one of [the states]'") (*quoting Tennessee v. Davis*, 100 U.S. 257, 263, 25 L.Ed. 648 (1879)).

6.      *Third*, this Court has federal question jurisdiction under 28 U.S.C. § 1331 because plaintiff's alleged injuries occurred at least in part on "federal enclaves"—namely, U.S. military facilities—and thus removal is proper under 28 U.S.C. § 1441.  (*See* Compl. ¶¶ 1, 2) (plaintiff alleges he used CAEv2 "while in training and/or deployed on active military duty" and "during live combat and during field training exercises both stateside and while deployed"); *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006) ("Federal courts have federal question jurisdiction over tort claims that arise on 'federal enclaves.'").

## REQUIREMENTS FOR REMOVAL

7.      This case is a civil action that was filed on February 15, 2019 in the Superior Court of Marion County, Indiana, styled *Jamie Peters v. 3M Company and Aearo Technologies LLC*, No. 49D07-1902-CT-006354.    (*See* Ex. 1, State Court Record; Ex. 2, Operative Complaint.)

8.      3M was served with the Complaint on February 19, 2019.  (*See* Ex. 1)

9.      3M has filed this Notice of Removal within thirty (30) days of when the summons and Complaint were served on February 19, 2019, and thus removal is timely under 28 U.S.C. § 1446(b).

10.     Removal to this Court is proper because the Superior Court of Marion County is located within the geographic reach of the U.S. District Court for the Southern District of Indiana.  28 U.S.C. § 1441(a).

11.     As required by 28 U.S.C. § 1446(a) and S.D. Ind. L.R. 81-2, 3M has attached to this Notice of Removal "a copy of all process, pleadings, and orders served upon" it.  More specifically, attached are the following documents: (a) Complete State Court Record, including docket, Complaint, all motions and orders (Ex. 1); and (b) the Operative Complaint (Ex. 2).

12.     As required by 28 U.S.C. § 1446(d), upon filing this Notice of Removal, 3M will provide written notification to plaintiffs' counsel and will file a Notification of Removal (attaching a copy of this Notice of Removal) with the Clerk of the Superior Court of Marion County.

13.     The amount in controversy, exclusive of interest and costs, exceeds $75,000 and, therefore, satisfies the jurisdictional amount requirement for diversity jurisdiction under 28 U.S.C. §1332.

14.     Plaintiff is a citizen of the state of Indiana.  Defendant 3M Company is a citizen of the states of Delaware and Minnesota.  Defendant Aearo Technologies LLC is a citizen of the states of Delaware and Minnesota as well.  (*See* Section I below)

15.     Defendant Aearo Technologies LLC consents to this removal and will separately file a Consent to Removal.

## BACKGROUND

16.     The CAEv2 is an earplug with two insertable ends developed specifically for the needs of the U.S. military for use as hearing protection in noisy environments.  CAEv2 has a yellow end and green end.  Each end has a different purpose. When the yellow end of the earplug is inserted, users can still hear nearby low-level sounds, like verbal communication, but receive protection from high-level impulse noise, like gunfire. In contrast, when the green end of the earplug is inserted, CAEv2 acts like a traditional earplug, providing steady and continuous protection from both ambient and impulse noise.

17.     In the area of national defense, the U.S. military relies on close collaboration with private contractors to design and develop products, such as the CAEv2, and manufacture and supply those products in accordance with highly particular specifications balancing the multitude of operational and budgetary needs of equipping the nation's fighting forces.  This litigation involves a classic example of that military-contractor collaboration.

18.     CAEv2 was designed at the request of and in consultation with military audiologists, including Dr. Doug Ohlin.  Ohlin at the time served in the capacity of Program Manager, Hearing Conservation, U.S. Army Center for Health Promotion and Preventive Medicine (USACHPPM).  Ohlin and his program gave direction to Aearo to ensure that the CAEv2 would appropriately balance performance with military operational needs for soldiers and military personnel.  For example, Ohlin proposed the inclusion of the filter that was a key

updated feature of the CAEv2. Ohlin specifically directed Aearo to ensure that the CAEv2 would fit into a military-issued carrying case. Ohlin also was involved in Aearo's testing of the CAEv2.

19.     Ohlin's involvement continued following the military's decision to purchase and deploy the CAEv2. He provided Aearo with feedback from military personnel as to using the CAEv2 and developed training and instructions for military personnel.

20.     Following the development of the product, Ohlin was involved in the ultimate approval of CAEv2 for military use and proposed purchasing CAEv2 to the Joint Readiness Clinical Advisory Board.

21.     The military's specifications for the CAEv2 reflect the design direction that Ohlin and his program gave to Aearo. In particular, these specifications are memorialized in a Medical Procurement Item Description (MPID) that was used by the Defense Logistics Agency (the U.S. military's purchasing authority) in soliciting bids from Aearo for the CAEv2. Among other things, the MPID specified "military unique, double-ended ear plugs suitable for use as hearing protectors for military personnel in chronically noisy environments," that should "be designed to provide protection from the unique noises created by military firearms, while allowing the wearer to clearly hear normal speech . . . such as voice commands, on the battlefield" and should be "camouflage green or another suitable dark color."

22.     In sum, the CAEv2 was launched at the request of, and in close coordination with, the U.S. military. The CAEv2's design reflects the direction and feedback of individuals acting on behalf of the U.S. military. The U.S. military purchased the CAEv2 and issued it to the military like Plaintiff precisely because the CAEv2 fulfilled the military's specifications and accomplished the military's goal of balancing hearing protection with operational needs.

## BASES FOR FEDERAL JURISDICTION AND REMOVAL

23.    A defendant need only submit a short and plain statement that sets forth plausible allegations supporting the grounds of removal.  *See Betzner v. Boeing Co.*, 910 F.3d 1010, 1014 (7th Cir. 2018); *see also Junhong v. Boeing Co.*, 792 F.3d 814-15 (7th Cir. 2015) (rejecting notion that federal jurisdiction hinges upon a high degree of certainty that jurisdictional facts exist).  The defendant is not required to make "evidentiary submissions."  *Id.*  Instead, "*jurisdictional allegations control unless it is legally impossible for them to be true*."  *Id.* (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007)) (emphasis added).  As the Seventh Circuit explained in *Betzner*:

> The general statute governing the removal of civil actions requires a defendant to file a notice of removal "containing a short and plain statement of the grounds of removal." *Dart Cherokee Basin Operating Co. v. Owens*, —— U.S. ——, 135 S.Ct. 547, 553, 190 L.Ed.2d 495 (2014) (quoting 28 U.S.C. § 1446(a) ). "By design, § 1446(a) tracks the general pleading requirement stated in Rule 8(a) of the Federal Rules of Civil Procedure." *Id.* When addressing good-faith amount-in-controversy allegations in a Class Action Fairness Act suit, the *Dart Cherokee Court* held a "statement 'short and plain' need not contain evidentiary submissions." *Id.* at 551; *see also Spivey v. Vertrue, Inc.*, 528 F.3d 982, 986 (7th Cir. 2008) ("Once the proponent of federal jurisdiction has explained plausibly how the stakes exceed $5 million, then the case belongs in federal court unless it is legally impossible for the plaintiff to recover that much.") (*citing Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ).

> *Dart Cherokee's* holding is not limited to amount-in-controversy allegations as the district court suggested. After *Dart Cherokee*, for example, we applied its holding beyond amount-in-controversy allegations when discussing admiralty jurisdiction as a basis of removal. *Lu Junhong v. Boeing Co.*, 792 F.3d 805, 814–15 (7th Cir. 2015). In doing so, we rejected the notion that "federal jurisdiction depends on a high degree of certainty that jurisdictional facts exist." *Id*. at 815. Instead, we held "[j]urisdictional allegations control unless it is legally impossible for them to be true." *Id*. Even before *Dart* Cherokee, we emphasized that a colorable federal defense under § 1442(a) need only be plausible. *Ruppel*, 701 F.3d at 1181–82; *Venezia v. Robinson*, 16 F.3d 209, 212 (7th Cir. 1994). Based on the plain

language of § 1446(a), as well as *Dart Cherokee* and our precedent, the standard in assessing removal allegations under § 1442(a) starts with Rule 8(a)'s short and plain statement requirement.

*Id.* at 1014. *See also Pudlowski v. The St. Louis Rams, LLC*, 829 F.3d 963, 964 (8th Cir. 2017) ("The Rams notice of removal did not need to be accompanied by a submission of evidence.").

## I.   THIS COURT HAS DIVERSITY JURISDICTION.

24.     Federal courts have diversity jurisdiction under 28 U.S.C. § 1332 "if the parties are citizens of different states and the amount in controversy exceeds $75,000 …." *Popov v. Portage Wolf LLC*, 2018 WL 5276504, at *1 (N.D. Ind. Oct. 24, 2018). Both requirements are met here.

### A.   The Parties Are Diverse.

25.     Diversity under 28 U.S.C. § 1332 requires "that no plaintiff may be from the same state as any defendant." *Hart v. FedEx Ground Package Sys. Inc.*, 457 F.3d 675, 676 (7th Cir. 2006).

26.     Plaintiff is a citizen of Indiana. (Compl. ¶ 2.)

27.     3M is not a citizen of Indiana. For diversity purposes, corporations "are citizens both of the state of incorporation and the state in which the corporation has its principal place of business." *Popov*, 2018 WL 5276504, at *1 (*quoting Wise v. Wachovia Sec., LLC*, 450 F.3d 265, 267 (7th Cir. 2006)). 3M is a Delaware corporation with its principal place of business in St. Paul, Minnesota. (Compl. at ¶ 3.) Thus, for diversity purposes, 3M is a citizen of Delaware and Minnesota. *Popov*, 2018 WL 5276504, at *1.

28.     Aearo Technologies LLC is not a citizen of Indiana, either. "The citizenship for diversity purposes of a limited liability company … is the citizenship of each of its members." *Popov*, 2018 WL 5276504, at * 2 (*quoting Wise*, 450 F.3d at 267). If the members of the limited

liability company are themselves limited liability companies, citizenship "must be traced through however many layers of … members there may be." *Hart v. Terminex Int'l*, 336 F.3d 541, 543 (7th Cir. 2003). Aearo Technologies LLC is (and was at the time this lawsuit was filed) 100% owned by Aearo LLC, a Delaware limited liability company. Aearo LLC is 100% owned by Aearo Intermediate LLC, a Delaware limited liability company. Aearo Intermediate LLC is 100% owned by Aearo Holdings LLC, a Delaware limited liability company. Aearo Holdings LLC is 100% owned by 3M Occupational Safety LLC, a Delaware limited liability company. 3M Occupational Safety LLC is 100% owned by 3M Company, which, as noted above, is a Delaware corporation with its principal place of business in Minnesota. Thus, for diversity purposes, Aearo Technologies LLC is also a citizen of Delaware and Minnesota. *See Wise*, 450 F.3d at 267 ("Wachovia Securities, LLC, it turns out, is owned by another limited liability company, which is owned in turn by two affiliated corporations one of which is a citizen of North Carolina and the other a citizen of New Jersey. The plaintiffs, we have learned, are citizens of Illinois. So there is the required diversity of citizenship, and we can proceed to the merits.").

29.    Plaintiff's attempt to avoid this conclusion is without merit. In particular, plaintiff alleges that "Aearo Technologies LLC is a limited liability company formed in Delaware with its principal place of business in Indiana" and thus "[t]here is no federal jurisdiction over this matter as Defendant Aearo Technologies LLC is a citizen of Indiana." (Compl. ¶¶ 4-5) Plaintiff's argument confuses ***corporations***, which, for diversity purposes, "are citizens both of the state of incorporation and the state in which the corporation has its principal place of business," with ***limited liability companies***, which, "despite the resemblance of such a company to a corporation," derives its citizenship from "each of its members." *Wise*, 450 F.3d at 267.

Because Aearo Technologies LLC is a limited liability company, and *not* a corporation, it takes its citizenship from its members and plaintiff's allegation that its "principal place of business [is] in Indiana" is beside the point. *Popov*, 2018 WL 5276504, at *2 (denying motion to remand; defendants "are limited liability companies" and "not corporations," and thus plaintiffs' argument that "defendants' 'primary place of business appears to be' in Indiana" is "irrelevant" to the diversity analysis).

**B.    The Amount In Controversy Requirement Is Met.**

30.    When removal is based on diversity of citizenship, "the matter in controversy [must] excee[d] the sum or value of $75,000." *Dart Cherokee*, 135 S. Ct. at 551 (2014) (*quoting* 28 U.S.C. § 1332).

31.    Plaintiff's complaint seeks an unspecified amount of "compensatory damages" and "equitable relief," including "monetary damages… to which Plaintiff is entitled at the time of trial" and "all such other and further relief as may be available at law or equity and may be proper under the circumstances." (*See* Compl. at p. 26).

32.    "When the plaintiff's complaint does not state the amount in controversy, the defendant's notice of removal may do so." *Dart Cherokee*, 135 S. Ct. at 551 (2014) (*citing* 28 U.S.C. § 1446(c)(2)(A)).  Among other ways, the amount in controversy requirement can be met where the allegations in the complaint "make it facially apparent that the amount in controversy exceeds $75,000." *Bunch v. Wal-Mart*, 2009 WL 1076162, at *3 (N.D. Ind. Apr. 20, 2009) (allegations of permanent injuries resulting from "slip and fall accident" sufficient to satisfy amount in controversy where, "[a]lthough the prayer for relief does not assert an exact amount of

damages allegedly sustained, Bunch prays for compensatory damages, prejudgment interest, costs of the action, and all other just and proper relief.").[2]

33.    Here, plaintiff alleges that "as a result of" wearing CAEv2 while serving in the military, he "now suffers from hearing loss and tinnitus." (Compl. ¶ 1.) Plaintiff's allegations regarding the nature and extent of this purported injury are sparse. However, claims involving allegations of hearing loss often result in verdicts of significantly more than $75,000. *E.g.*, *Rivenburgh v. CSX Transp.*, 280 F. App'x 61, 65 (2d Cir. 2008) (reducing $1,000,000 jury verdict to $400,000 where plaintiff "suffered a hearing loss at the conversational frequency in one ear, which now requires him to use a hearing aid in that ear").[3] Indeed, according to plaintiff, "[h]earing maladies cost more than $1.4 billion in veterans' disability payments ***annually***." (Compl. at p. 11. (emphasis added).) Thus, it is facially apparent from the complaint that the amount in controversy in this lawsuit exceeds the sum or value of $75,000.

\*        \*        \*

---

[2]    *See also Quinn v. Kimble, 228 F. Supp. 2d 1036, 1038 (E.D. Mo. 2002) ("it is 'facially apparent' from the petition that the claimed damages exceeded $75,000"); Hollenbeck v. Outboard Marine Corp.*, 201 F. Supp. 2d 990, 994 (E.D. Mo. 2001), citing *McNeilus Truck & Mfg., Inc. v. Hunt,* 2001 WL 837940, at \*2 (D. Minn. Sept. 14, 2001) ("removing defendant can meet burden . . . if, on the face of the Complaint, it is apparent that the claims are likely to be above that amount"); *Gebbia v. Wal-Mart Stores, Inc.*, 233 F.3d 880, 883 (5th Cir. 2000) (affirming denial of motion to remand where Court concluded it was "facially apparent" that claims exceeded $75,000); *In re Silica Prods. Liab. Litig.*, 398 F. Supp. 2d 563, 646-47 (S.D. Tex. 2005) (although complaints did not include specific monetary demands, it was facially apparent that each of the claims exceeded the jurisdictional amount of $75,000 necessary for removal based on diversity of citizenship).

[3]    The court in *Rivenburgh* noted that "[o]ther hearing impairment cases we have found include *Mullet v. Wheeling & Lake Erie R.R. Co.*, 2003 WL 21469150, at \*1, (Ohio Ct.App. June 26, 2003) (verdict of $102,000 for tinnitus—a ringing in the ears); *CSX Transportation., Inc. v. Dansby*, 659 So.2d 35, 37–38 (Ala. 1995) (verdict of $105,000 for hearing loss at the conversational level); *CSX Transportation, Inc. v. Bryant*, 589 So.2d 706 (Ala. 1991) (verdict of $25,000 for loss of hearing)." *Id.*

34.     Therefore, all the requirements are met for removal under 28 U.S.C. §§ 1332 and 1441.  Because the controversy in this civil action is wholly between citizens of different states and because, based on the allegations contained in the Complaint, the amount in controversy exceeds the sum of $75,000, exclusive of costs and interest, 3M may remove this action pursuant to 28 U.S.C. §§ 1332 and 1441.

## II.    REMOVAL IS PROPER UNDER THE FEDERAL OFFICER REMOVAL STATUTE.

35.     Removal is also proper under 28 U.S.C. § 1442(a)(1), which provides for removal when a defendant is sued for acts undertaken at the direction of a federal officer.

36.     Removal rights under this section are much broader than under the general removal statute, 28 U.S.C. § 1441.  *See Ayo v. 3M Co.*, 2018 WL 4781145, at *6 (E.D.N.Y. Sept. 30, 2018) ("[W]hile removal under the general removal statute, 28 U.S.C. § 1441, is generally disfavored, removal under the federal officer removal statute is favored in the interest of public policy.") (internal citations and quotations omitted).  "Suits against defendants acting on behalf of federal officers "may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999).  This is because Section 1442 protects "the government's need to provide a federal forum for its officers and those who are 'acting under' a federal office." *Albrecht v. A.O. Smith Water Prod.*, 2011 WL 5109532, at *3 (S.D.N.Y. Oct. 21, 2011).  This important federal policy "should not be frustrated by a narrow, grudging interpretation of s 1442(a)(1)." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969).  And a court analyzing removal under the federal officer statute "views the facts in the light most favorable to the defendants." *Ayo*, 2018 WL 4781145, at *6.

37.    "Federal officer removal is proper when the defendant (1) is a person within the meaning of the statute, (2) is acting under the United States, its agencies, or its officers, (3) is acting under color of federal authority, and (4) has a colorable federal defense."  *Betzner*, 910 F.3d at 1015 (internal citations omitted).  All requirements for removal under § 1442(a)(1) are satisfied here.

### A.    3M Is A "Person" Under The Federal Officer Removal Statute.

38.    3M is a "person" under the federal officer removal statute.  *See Betzner*,  910 F.3d at 1015 ("Corporations are persons under § 1442(a), and so, Boeing has easily satisfied the 'person' requirement within the meaning of the federal officer removal statute."); *see also Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 812 (3d Cir. 2016) (for purposes of § 1442(a)(1), the term "person" includes "'companies, associations, firms, [and] partnerships.'").

### B.    The "Acting Under" Requirement Is Satisfied.

39.    To satisfy the second requirement ("acting under" a federal officer) "a private person's actions 'must involve an effort to assist, or to help carry out, the duties or tasks of the federal superior.'"  *Jacks*, 701 F.3d at 1230 (holding that health insurer contracted by U.S. Office of Personnel Management was "acting under" a federal officer) (*quoting Watson*, 551 U.S. at 152); *Ayo*, 2018 WL 4781145, at *7 (a private company acts under the Unites States when it "helps the government develop a product at the government's request").  "The words 'acting under' are to be interpreted broadly."  *Isaacson*, 517 F.3d at 136.  Federal courts "have explicitly rejected the notion that a defendant could only be 'acting under' a federal officer if the complained-of conduct was done at the specific behest of the federal officer or agency."  *Papp*, 842 F.3d at 813; *see also Jacks*, 701 F.3d at 1230 (although "not limitless, '[t]he words "acting under" are broad,' and the Supreme Court 'has made clear that the statute must be 'liberally

construed.'") (*quoting Watson*, 551 U.S. at 147); *see also Betzner*, 910 F.3d at 1015 ("Here, Boeing plausibly alleged that it acted under federal officers when it contracted to manufacture heavy bomber aircraft for the United States Air Force, and that it acted under the military's detailed and ongoing control. In doing so, Boeing's allegations adequately state that it was assisting or carrying out the duties of the United States Air Force.").

40.     The "acting under" requirement is met here because Plaintiff directly challenges Defendants' alleged conduct in providing vital products to, and at the direction of, the military and which "in the absence of Defendants, the Government would have had to produce itself." *Isaacson*, 517 F.3d at 137.  As discussed above, Aearo designed and manufactured the CAEv2 at the direction of the U.S. military to meet the military's specific needs to provide hearing protection.

41.     Indeed, Plaintiff's Complaint effectively concedes that Aearo was "acting under" federal officers of the Department of Defense and its agencies when manufacturing and selling the CAEv2 he was provided.  Plaintiff alleges that Aearo specifically developed the CAEv2 for the military's use and to meet the military's specifications:

> a.      "Aearo developed dual-ended nonlinear (selective attenuation) Combat Arms™ earplugs for the specific purpose of providing servicemen a single set of earplugs that provide two options for hearing attenuation depending on how they are worn[.]" (Compl. at Ex. 2. ¶ 9.)

> b.      "Based on the supposed technological design and qualities of the Combat Arms™ earplugs, Defendants won a series of Indefinite-Quantity Contracts ('IQCs') to be the exclusive supplier of selective attenuation earplugs to the U.S. military between 2003 and 2012."  (*Id. at* ¶11 .)

> c.      "To win these IQCs, Defendants represented that the Combat Arms™ earplugs would meet specific performance criteria established by the U.S. Government as a prerequisite for bidding on the IQC for earplugs."  (*Id.* ¶ 12.)

d.    "In addition, the U.S. military may only purchase earplugs that meet the testing standards established by the U.S. Army Public Health Command, Army Hearing Program, or equivalent standards that may be established by other branches of the military." (*Id.* ¶ 19.)

42.    Not only did Aearo meet "specific performance criteria established by the U.S. Government," it developed the CAEv2 under the direction of, and with significant involvement of, representatives of the U.S. military. *See e.g. Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012) (holding that defendant was "acting under" a federal officer because it "worked hand-in-hand with the government, assisting the federal government in building warships. 'Acting under' covers situations, like this one, where the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete."); *Isaacson*, 517 F.3d at 137 ("Defendants contracted with the Government to provide a product that the Government was using during war—a product that, in the absence of Defendants, the Government would have had to produce itself."); *In re National Prescription Opiate Litig.*, 327 F. Supp. 3d 1064, 1075-76 (N.D. Ohio 2018) (removal under § 1442 was appropriate were defendant was subject to "precise specifications" of government contract, administration of contract was overseen by federal official, and absent defendant's role, government would have had to warehouse and distribute product itself).

43.    As described above, the military's involvement went beyond merely establishing standards or general guidelines. Its involvement also included requests to modify operational features, such as ensuring the CAEv2 would fit in military-issued containers. Such involvement is quintessential activity "acting under" a federal officer. *See e.g. Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387 (5th Cir. 1998) (authorizing removal of a tort suit against private defense contractors that manufactured Agent Orange); *Gordon v. Air & Liquid Sys. Corp.*, 990 F. Supp. 2d 311, 320 (E.D.N.Y. 2014) (contractor was "acting under" a federal officer for purposes

of removal statute when it provided products used in construction of ships to Navy's precise specifications); *Betzner*, 910 F.3d at 1015 ("Boeing plausibly alleged that it acted under federal officers when it contracted to manufacture heavy bomber aircraft for the United States Air Force, and that it acted under the military's detailed and ongoing control."); *Ayo*, 2018 WL 4781145 (3M "acted under" a federal officer when it "helped the government" develop an important military product "at the government's request").

### C.    The "Causation" Requirement Is Satisfied.

44.    Whether a defendant's actions were taken "under color of federal office . . . has come to be known as the causation requirement." *Isaacson*, 517 F.3d at 137 (internal quotation marks, alterations, and citation omitted); *see also Betzner*, 910 F.3d at 1015 (the "acting under the color of federal authority" requirement," is "distinct from the 'acting under' requirement in the same way a bona fide federal officer could not remove a trespass suit that occurred while he was taking out the garbage—there must be a 'causal connection between the charged conduct and asserted official authority.'"). Like the "acting under" requirement, "[t]he hurdle erected by this requirement is quite low." *Id.* Courts "credit Defendants' theory of the case when determining whether [this] causal connection exists." *Isaacson*, 517 F.3d at 137 (*citing Acker*, 527 U.S. at 431-32 (1999) ("demanding an airtight case on the merits in order to show the required causal connection" would "defeat the purpose of the removal statute").[4] In 2011, Congress further expanded Section 1442 by amending section 2(b) to permit removal "for ***or relating to*** any acts under color" of federal office, so as "to broaden the universe of acts that enable Federal officers to remove to Federal court." H.R. REP. 112-17, 6, 2011 U.S.C.C.A.N.

---

[4]    The "acting under" and "under color of" prongs overlap. Both "are satisfied if the actions subject to suit resulted directly from government specifications or direction." *Albrecht*, 2011 WL 5109532, at *5.

420, 425 (emphasis showing addition). "To show causation, Defendants must only establish that the act that is the subject of Plaintiffs' attack . . . occurred *while* Defendants were performing their official duties." *Isaacson*, 517 F.3d at 137-38 (emphasis in original).

45.    Here, Plaintiff's claims arise from Defendants' production and sale of CAEv2 to military specifications.  Plaintiff alleges that the design of the CAEv2 is defective.  Aearo developed and designed CAEv2, including establishing its length, at the direction of federal officers.  With respect to the alleged design defect regarding the length or fit of the earplugs in particular, the government asked Aearo to design a multi-functioning earplug with a shortened stem in order to easily fit into government-issued carrying containers. *See Ayo*, 2018 WL 4781145, at *9 (denying motion to remand and finding causal connection where the conduct complained of occurred *because of* what the government asked contractors to do) (emphasis in original); *see also Betzner v. Boeing Co.*, 910 F.3d 1010, 1015 (7th Cir. 2018) ("Boeing has sufficiently stated a causal connection between the Betzners' negligence claims and its official actions controlled by the military.").

46.    Moreover, even if Plaintiff were to assert that any alleged defect was the result of an act not specifically contemplated by the government contract, "it is enough that the contracts gave rise" to the harm alleged.  *See Isaacson*, 517 F.3d at 138.  "[W]hether the challenged act was outside the scope of Defendants' official duties, or whether it was specifically directed by the federal Government, is one for the federal—not state—courts to answer." *Id.* (*citing Willingham*, 395 U.S. at 409.).  Thus, any argument that the alleged defect was not specifically directed by the government cannot defeat federal officer removal. *See Ayo*, 2018 WL 4781145, at *9 ("To satisfy the causation requirement, Manufacturing Defendants need only show that the

conduct at issue occurred during their performance of the government-directed action, even if the government did not call for the complained-of act.").

       **D.**    **3M Has "Colorable" Federal Defenses.**

      47.    3M intends to assert federal defenses in response to Plaintiff's claims, including both the government contractor defense and the combatant activities defense.

      48.    Courts around the country have held that the government contractor defense and the combatant activities defense support removal under § 1442(a)(1). *See, e.g.*, *Betzner*, 910 F.3d at 1015-16 (finding colorable government contractor defense supports removal under Section 1442); *Jacks*, 701 F.3d at 1234-35 (same); *Isaacson*, 517 F.3d at 139 (same); *Zeringue v. Crane Co.*, 846 F.3d 785 (5th Circuit 2017) (same); *McMahon v. Presidential Airways, Inc.*, 410 F. Supp. 2d 1189, 1200 (M.D. Fla. 2006) (both government contractor defense and combatant activities defenses supported removal under Section 1442).

      49.    "[A]t this stage of the litigation, [removing defendants] need only show that their defense is "colorable." *Ayo*, 2018 WL 4781145, at *9 (citing *Willingham*, 395 U.S. at 406-07); *Betzner*, 910 F.3d at 1016 (requiring only plausible allegations of a colorable government contractor defense to support removal); *Winters v. Taylor*, 2009 WL 1788598, at *2 (7th Cir. June 23, 2009) ("The federal officers need only assert a defense that is 'plausible,' not necessarily successful to remove under Section 1442(a)) (citing *Venezia v. Robinson*, 16 F.3d 209, 212 (7th Cir. 1994). Indeed, "[b]ecause a core purpose of the [federal officer removal] statute is to let the 'validity of the [federal] defense' be 'tried in federal court,' a defendant seeking removal need not 'virtually ... win his case,' nor must his defense even be 'clearly sustainable' on the facts." *Ayo*, 2018 WL 4781145, at *9; *Jacks*, 701 F.3d at 1235 (courts will

not "require that these defenses be clearly sustainable in order to support removal under § 1442(a)(1)). As the Seventh Circuit explained in *Betzner*:

> The colorable federal defense requirement fulfills Article III jurisdiction and reflects Congress's intent to have federal defenses litigated in federal court. *Id.* at 1182. "Requiring the defense only be colorable, instead of 'clearly sustainable,' advances this goal" and "at this point, we are concerned with who makes the ultimate determination, not what that determination will be." Id. (internal citations omitted); *see also Willingham*, 395 U.S. at 407, 89 S.Ct. 1813 (A defendant invoking § 1442(a) "need not win his case before he can have it removed."); *Venezia*, 16 F.3d at 212 ("A federal defendant need not show that he is entitled to prevail in order to have access to the federal forum.") (emphasis in original).

*Betzner.*, 910 F.3d at 1015–16.

50.     Additionally, at the removal stage, the inquiry "is purely jurisdictional, and neither the parties nor the district courts should be required to engage in fact-intensive motion practice, pre-discovery, to determine the threshold jurisdictional issue." *Cuomo*, 771 F.3d at 116 (citing *Kircher v. Putnam Funds Trust*, 547 U.S. 633, 644 n. 12 (2006)); *Betzner*, 910 F.3d at 1016 (holding that "the district court erred in concluding that Boeing was required to submit evidence to support its removal allegations").[5]   Moreover, "this inquiry is undertaken whilst viewing the facts in the light most favorable to Defendants." *Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770, 783-84 (E.D. Pa. 2010). "Precisely in those cases where a plaintiff challenges the factual sufficiency of the defendant's defense, the defendant should 'have the opportunity to present [his] version of the facts to a federal, not a state, court.'" *Cuomo*, 771 F.3d at 116 (quoting *Willingham*, 395 U.S. at 409).

---

[5] *See also Kraus v. Alcatel-Lucent*, Civil Action No. 18-2119, 2018 WL 3585088, at *2 (E.D. Pa. July 25, 2018) ("A court does not 'determine credibility, weigh the quantum of evidence or discredit the source of the defense' at this stage. Instead, [the court] only determines whether there are sufficient facts alleged to raise a colorable defense.").

### (1)    3M Has A Colorable Government Contractor Defense.

51.    Under the government contractor defense, the defendant is not liable for alleged defects or negligence with respect to military equipment or supplies "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States."  *Boyle*, 487 U.S. at 512; *see also Betzner*, 910 F.3d at 1016 (same).

52.    3M has satisfied all of these elements for purposes of removal. *First*, as discussed above, the Defense Logistics Agency established reasonably precise specifications governing double-ended non-linear earplugs' performance, testing, inspection, packaging, and labeling, with which the CAEv2 complied.  Plaintiff likewise alleges that the CAEv2 were subject to stringent military specifications.  (Compl. ¶12 ("Defendants represented that the Combat Arms™ earplugs would meet specific performance criteria established by the U.S. Government as a prerequisite for bidding on the IQC for earplugs."),  *Second*, when properly used, the CAEv2 fully conform to those specifications.  (*Cf.* Compl. ¶19 ("[T]he U.S. military may only purchase earplugs that meet the testing standards established by the U.S. Army Public Health Command, Army Hearing Program.").)  *Third*, the government was adequately informed regarding alleged product-related "dangers," *Boyle*, 487 U.S. at 512, to exercise its discretionary authority in specifying and procuring the CAEv2 earplugs.  The U.S. military was actively involved in discussions with Aearo in the development of the CAEv2 regarding its length and instructions for use.  Aearo's engineers discussed the challenges, and trade-offs, in conforming the design of the CAEv2 to fit within the military's desired carrying cases and with its other equipment.  These facts are more than enough to support a "colorable" government contractor defense and removal

under the federal officer statute. *See Betzner*, 910 F.3d at 1016 (finding government contractor defense colorable where defendant provided plausible allegations it manufactured aircraft according to government specifications and government was aware of any potential hazards).

53.    At minimum, this constitutes colorable evidence that the U.S. military generally "made a discretionary determination" regarding the requirements and design of the CAEv2's benefits against the alleged risks. *See In re Agent Orange Prod. Liab. Litig.*, 517 F.3d 76, 90 (2d Cir. 2008); *Ayo*, 2018 WL 4781145, at *14 (holding removal proper under §1442 because defendants presented "colorable evidence" that government was aware of alleged problems with product at issue); *see also Albrecht*, 2011 WL 5109532, at *5 ("A defendant is not required to warn the government where 'the government knew as much or more than the defendant contractor about the hazards of the product.'") (citation omitted). Where, as here, the government has exercised "discretionary authority over areas of significant federal interest such as military procurement," the government contractor defense applies. *Agent Orange*, 517 F.3d at 89-90; *see also Ayo*, 2018 WL 4781145, at *13.

### (2)    3M Has A Colorable Combatant Activities Defense

54.    The "combatant activities defense" is a complete defense for claims arising out of combat activities. Although Congress waived sovereign immunity for tort claims against the United States and those acting on its behalf in the Federal Tort Claims Act, it excluded "claims arising out of combatant activities of the military or armed forces, or the Coast Guard, during time of war." 28 U.S.C. § 2680(j). The combatant activities exception has been applied to contractors to create a federal defense shielding manufacturers from tort claims arising from war. *See, e.g., Saleh v. Titan Corp.*, 580 F.3d 1, 6 (D.C. Cir. 2009) (applying § 2680(j) exception to tort claims arising from treatment of inmates in military prison in Iraq brought against private

contractor); *Bentzlin v. Hughes Aircraft Co.*, 833 F. Supp. 1486, 1492 (C.D. Cal. 1993) ("The combatant activities exception generates a federal common law defense which immunizes manufacturers such as Hughes from state tort suits arising from war.").  The combatant activities defense is broader than the government contractor defense under *Boyle* because it acts like "field preemption because it casts a[n] immunity net over any claim that *arises* out of combat activities." *Saleh*, 580 F.3d at 6 (emphasis in original; internal citation omitted).

55.    Application of the defense has two elements: (1) the presence of combatant activities; and (2) that such activities occur during a time of war.  The combatant activities element has been liberally construed and is not limited to the exertion of physical force.  *See Johnson v. U.S.*, 170 F.2d 767, 770 (9th Cir. 1948).  Rather, "activities both necessary to and in direct connection with actual hostilities" are included.  *Id.*  Ammunition supply, troop movement and logistical support, and holding prisoners of war have all qualified as combatant activities under the test.  *See Aiello v. Kellogg, Brown & Root Servs.*, 751 F. Supp. 2d 698, 706 (S.D.N.Y. 2011).

56.    Each element is satisfied here.  First, Plaintiff's Complaint alleges that he suffered hearing loss, at least in part, because of his involvement in combat, and that the CAEv2 issued to him by the Navy failed to provide adequate protection.  (Compl. ¶1. ("Plaintiff used Defendants' dual-ended Combat Arms Earplugs – (Version 2 CAEv.2) while in training and/or deployed on active military duty and, as a result of its defective condition, now suffers from hearing loss and tinnitus."); ¶2 ("Mr. Peters wore the 3M dual-ended earplugs during live combat and during field training exercises both stateside and while deployed.")  Second, Plaintiff's alleged activities occurred during combat activities and/or a time of war during his deployment at one or more locations during his time serving in the U.S. Military.  (*E.g.*, Compl. at ¶¶ 1, 2 ("Plaintiff used

Defendants' dual-ended [CAEv.2] while in training and/or deployed on active military duty," and plaintiff "wore the 3M dual-ended earplugs during live combat and during field training exercises both stateside and while deployed.").  Claims in such circumstances fall within the scope of the combatant activities defense. See e.g., Bentzlin, 833 F. Supp. at 1492-95 (holding that claims brought against missile manufacture for causing death of U.S. soldiers as a result of alleged product defect were barred by combatant activities defense).

57.     Accordingly, 3M has a colorable basis for asserting that it is immune from tort claims arising from Plaintiff's harm suffered while he was engaged in combatant activities. This defense separately supports federal question jurisdiction under Section 1442 and removal to this Court.

### (3)     This Case Presents A Nonjusticiable Political Question

58.     3M also intends to argue that Plaintiff's suit presents a nonjusticiable political question.  "[M]ilitary activities often give rise to political questions." *McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1358 (11th Cir. 2007).  Courts have recognized that "the interjection of tort law into the realms of foreign policy and military affairs would effectively permit judicial reappraisal of judgments the Constitution has committed to the other branches." *Id.* (citation and internal quotation omitted).  Thus, decisions about "[t]he strategy and tactics employed on the battlefield" are beyond a federal court's ability to review. *Tiffany v. United States*, 931 F.2d 271, 277 (4th Cir. 1991).

59.     As a general matter, cases brought by "soldiers injured at the hands of the military raise political questions." *Whitaker*, 444 F. Supp. 2d at 1281; *see also Bentzlin*, 833 F. Supp. at 1497-98, *Carmichael v. Kellogg Brown & Root Servs., Inc.*, 572 F.3d 1271 (11th Cir. 2009). Moreover, "a soldier injured at the hands of a contractor which is performing military functions

subject to the military's orders and regulations also raises the same political questions." *Whitaker*, 444 F. Supp. 2d at 1281.

60.    This is such a case.  Plaintiff was in the Navy.  He alleges that he "wore the 3M dual-ended earplugs during live combat and during field training exercises both stateside and while deployed." (Compl. ¶ 2).   There is no doubt that the Navy made the decision to issue the CAEv2 to Plaintiff, that the Navy directed Plaintiff's training at the firing range, and that the Navy directed his activities in combat.[6]  *See Whitaker*, 444 F. Supp. 2d at 1279 (concluding that suit against Army contractor for negligent operation of a convoy vehicle presented a political question where the Army regulated "all aspects of control, organization, and planning of Army convoy operations").

61.    As discussed above, the design of the CAEv2 reflects the balance struck by the military between hearing protection and military operational needs.  The decision to issue the CAEv2 to the Navy, and the instructions to Plaintiff and other military, about when and where to use them, was made by the U.S. military.  Accordingly, resolution of Plaintiff's claims for design defect and inadequate warnings requires inquiry into the military's decisions and conduct.  *See Gilligan v. Morgan*, 413 U.S. 1, 10 (1973) ("The complex subtle, and professional decisions as to the composition, training, equipping and control of a military force are essentially professional military judgments, subject always to civilian control of the Legislative and Executive Branches.").   Plaintiff's claims therefore are nonjusticiable and are barred by the political question doctrine.

---

[6]    This case is, therefore, unlike *Brokaw v. Boeing Co.*, 137 F. Supp. 3d 1082, 1104 (N.D. Ill. 2015), where the court rejected the application of the political question doctrine and remanded to state court because the plaintiffs were family members of civilian contractors, not service members, and the military had "only tangential involvement" in those civilians' deaths in a plane crash.

## IV.    THIS COURT HAS FEDERAL ENCLAVE JURISDICTION.

62.    In addition, removal of this action is proper because Plaintiff's claims almost certainly arose, at least in part, at a federal enclave—namely, a U.S. military facility.  (*E.g.*, Compl. ¶ 1 ("Plaintiff used Defendants' dual-ended [CAEv.2] ***while in training*** and/or deployed on active military duty and, as a result of its defective condition, now suffers from hearing loss and tinnitus.") (emphasis added).)

63.    A federal enclave is a portion of land, such as a military base, "over which the United States government exercises federal legislative jurisdiction."  *Brookhaven Sci. Assocs., LLC v. Donaldson*, No. 04 Civ. 4013(LAP), 2007 WL 2319141, at *5 (S.D.N.Y. Aug. 9, 2007) (internal quotation and citation omitted).  The Constitution confers on Congress the power "[t]o exercise exclusive legislation" over the District of Columbia "and to exercise like authority over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dockyards, and other needful buildings."  U.S. Const. art. I, § 8, cl. 17.  "It has long been settled that where lands for such a purpose are purchased by the United States with the consent of the State legislature, the jurisdiction theretofore residing in the state passes, in virtue of the constitutional provision, to the United States, thereby making the jurisdiction of the latter the sole jurisdiction."  *Surplus Trading Co. v. Cook*, 281 U.S. 647, 652 (1930).

64.    Because the United States exercises sole lawmaking authority over a federal enclave, the law applicable to that enclave is, by definition, federal law, although such federal law may incorporate state-law rules of decision.  *See, e.g.*, *Mater v. Holley*, 200 F.2d 123, 124 (5th Cir. 1952) ("[A]ny law existing in territory over which the United States has 'exclusive' sovereignty must derive its authority and force from the United States and is for that reason

federal law"); *accord Macomber v. Bose*, 401 F.2d 545, 546 (9th Cir. 1968) ("State law theretofore applicable within the [ceded] area was assimilated as federal law, to remain in effect until changed by Congress. Rights arising under such assimilated law, arise under federal law and are properly the subject of federal jurisdiction."); *Brookhaven Sci. Assocs.,* 2007 WL 2319141, at *5 ("[W]hen an area becomes a federal enclave, the state law in effect at the time of cession becomes federal law and is the applicable law unless Congress provides otherwise.").

65.     Federal courts have federal-question jurisdiction under 28 U.S.C. § 1331 for actions involving tort claims that arise on federal enclaves.  *See, e.g.*, *Akin v. Ashland Chem. Co.*, 156 F.3d 1030, 1034 (10th Cir. 1998) (movant properly removed case to federal court when case was removed based on, among other things, status of the Air Force base as a federal enclave). Thus, such actions, if originally filed in state court, may be removed to federal court under 28 U.S.C. § 1441(a).  *See, e.g.*, *Allison v. Boeing Laser Tech. Servs.*, 689 F.3d 1234, 1236 (10th Cir. 2012) (affirming grant of summary judgment on state employment law claims as barred by federal enclave doctrine after removal from state court).

66.     While Plaintiff's Complaint does not specifically identify the U.S. military facilities where he was issued and used CAEv2 and allegedly suffered hearing damage, one or more of these facilities undoubtedly qualifies as a federal enclave.  *See Jamil v. Workforce Res., LLC*, Case No.: 18-CV-27-JLS (NLS), 2018 WL 2298119, at *2 (S.D. Cal. May 21, 2018) (inferring from Complaint that some of the alleged events must have occurred at Marine Corps base, a federal enclave, and denying motion to remand).

67.     Because Plaintiff's claims almost certainly arose, at least in part, at a federal enclave, this Court has subject matter jurisdiction over the action under 28 U.S.C. § 1331, and removal of the action is proper under 28 U.S.C. § 1441(a).

## CONCLUSION

For all the foregoing reasons, 3M hereby removes this action from the Marion County Superior Court, to this Court. As noted above, co-defendant Aearo Technologies LLC consents to this removal.

Respectfully submitted,

LEWIS BRISBOIS BISGAARD & SMITH LLP

By:    /s/ Renee J. Mortimer
          Renee J. Mortimer (20724-45)
          E-mail: Renee.Mortimer@lewisbrisbois.com
          Scott B. Cockrum (20840-45)
          E-mail: Scott.Cockrum@lewisbrisbois.com
          222 Indianapolis Blvd., Suite 207-5
          Schererville, IN 46375
          Renee J. Mortimer Direct: 219.440.0604
          Scott B. Cockrum Direct: 219.440.0602
          T: 219.440.0600/F: 219.440.0601